**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.                                                     CRIMINAL ACTION NO. 3:19-00154

ANTONIO MAURICE DAVIS,
        also known as "Johnathon Mason"

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Antonio Maurice Davis' Motion to Suppress. *Mot. to Suppress*, ECF No. 30. Defendant filed his motion on December 31, 2019, the Government filed a Response in Opposition on January 7, 2020, and Defendant filed a Reply on January 10, 2020. *Mot. to Suppress*, at 1; *Resp. in Opp'n*, ECF No. 32, at 1; *Reply*, ECF No. 33, at 1. A hearing on the Motion was held on January 13, 2020, at which Officer Brian Adkins and Detective Steven Maniskas of the Huntington Police Department testified. *Witness List*, ECF No. 35, at 1. For the reasons set forth below, the Court **DENIES** the Motion.

**I. BACKGROUND**

On May 15, 2019, officers from the Huntington Police Department were attempting to locate Defendant—a person of interest in connection with a recent homicide—by conducting surveillance on 12th Avenue between 10th Street and 12th Street in Huntington, West Virginia.[1] A detective observed Defendant walking in the area, eventually entering a residence at 1032 12th Avenue. While surveillance was underway, a gray van pulled into the residence's driveway. The

---

[1] The factual background of this case is drawn from testimony presented at the January 10 Motions Hearing and a recording of the phone call between Detective Maniskas and dispatch that is appended to the Government's Response as Exhibit A. *Ex. A*, ECF No. 32-1.

driver—identified as Antoine Qualls—exited the van and entered the home. Moments later, Qualls and Defendant exited the home and carried several bags to the van. They entered the vehicle and backed out of the driveway, with Qualls driving and Defendant in the passenger seat.

At this point, Detective Stephen Maniskas of the Huntington Violent Crime-Drug Task Force decided to check the status of Qualls' license. Maniskas—acquainted with Qualls from prior investigations—called a dispatcher and asked her to check for a valid license for Qualls in Michigan, West Virginia, and Ohio. Maniskas chose these states because Qualls was originally from Michigan, was living in West Virginia, and had apparently been involved with criminal activity in Ohio at some point in the past. Dispatch concluded that Qualls' Michigan license had been suspended or terminated on March 4, 2014, but that it was not set to expire until June 16, 2022. Confronted with this ambiguity, Maniskas responded "So . . . we're going to go with this . . . is suspended . . . right?" The dispatcher was noncommittal in response: "I think so? Because doesn't Michigan ID cards . . . aren't they the same number even if they are a suspended license? Says suspended 3/4/14." Without further comment, the dispatcher turned to West Virginia and determined that "all he has is the ID card, and it's expired as of 2017." Maniskas then asked the dispatcher to "check Ohio . . . real quick, just to be sure." After approximately a minute of searching, the dispatcher responded that a response had come from Ohio but that the license was listed as an unknown number. "So . . . you're unable to find a driver's [license] through Ohio, correct?" confirmed Maniskas. The dispatcher responded that "it came through, Ohio, which is weird, but it says failure to reinstate as the status, so I'd say he did have one but it doesn't have a number associated with it . . . but it is his name."

With no responses indicating that Qualls was driving with a valid license, Maniskas contacted Officer Brandon Adkins of the Huntington Police Force to stop the van to check the

status of Qualls' license. Near 14th Street and Charleston Avenue, Adkins initiated the stop and began walking toward the van from behind. Detective Maniskas and another officer arrived seconds later, with Maniskas remaining in the car and the other officer approaching the passenger side of the van while Adkins approached the driver's side. Upon reaching the van, Adkins requested Qualls' license. At the same time, he immediately detected the odor of marijuana emanating from the window. In light of the smell, Adkins ordered Qualls and the defendant from the vehicle. The officers called a K-9 unit, which arrived within fifteen minutes. The K-9 alerted near the van and signaled the presence of narcotics.

Upon searching the van, officers discovered a credit card skimmer and blank credit cards, several bags of what appeared to be narcotics, and multiple firearms. Officers also located marijuana in Defendant's pocket as they patted him down, along with approximately $10,521 in cash also on his person. It is unclear when—or even if—officers on the scene checked the status of Qualls' license, but at some point after Defendant's arrest they determined that the license was, in fact, valid. On June 18, 2019, a grand jury returned a three-count indictment charging Defendant with Possession with Intent to Distribute Fentanyl and Heroin, Possession of Firearms in Furtherance of Drug Trafficking, and being a Felon in Possession of Firearms. It is these charges that have led to the instant Motion to Suppress.

## II. LEGAL STANDARD

The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is beyond dispute that "[a]n automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable'," *United States v. Branch*, 537 F.3d 238, 335 (4th Cir. 2008), as the "[t]emporary detention of individuals during the stop of an automobile

by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment," *Whren v. United States*, 517 U.S. 806, 809 (1996). While the Constitution "says nothing about suppressing evidence obtained in violation" of the Fourth Amendment, *Davis v. United States*, 564 U.S. 229, 236 (2011), the exclusionary rule mandates that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source," *Mapp v. Ohio*, 367 U.S. 643, 654 (1961).

"The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrests, which must be supported by probable cause[;] . . . (2) brief investigatory stops, which must be supported by reasonable articulable suspicion[;] . . . and (3) brief encounters between police and citizens, which require no objective justification." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002). Automobile stops are "more akin to an investigative detention than a custodial arrest," *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015), and therefore need not be supported by probable cause, *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Instead, officers need only possess the reasonable suspicion that that criminal activity "may be afoot." *Id.*

The task of determining whether an officer possessed the reasonable, articulable suspicion necessary to carry out an investigative stop defies easy summation. The reasonable suspicion standard "is not readily, or even usefully, reduced to a neat set of legal rules, but rather entails commonsense, nontechnical conceptions that deal with factual and practical considerations of everyday life." *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010). Despite these conceptual difficulties, reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Nevertheless, police must still have "a particularized and objective basis for suspecting the person stopped of criminal activity." *Ornales v. United States*, 517 U.S. 690, 696

(1996). A court considering whether an officer possesses such a particularized and objective basis to justify a stop must look to the "totality of the circumstances confronting a police officer." *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989). This requires Courts to determine "whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Bowman*, 883 F.3d 200, 213 (4th Cir. 2018) (internal quotations omitted).

In analyzing the reasonableness of an investigative stop, courts turn to the two-prong test enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968). The first prong of the *Terry* test requires courts to examine "whether [an] officer's action was justified at its inception." In the majority of cases involving traffic stops, this requirement is easily met because where "a police officer observes a traffic violation, he is justified in stopping a vehicle." *Branch*, 537 F.3d at 337. Where—as here— police do not directly witness a traffic violation, the Court nonetheless finds guidance in the principle that "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation," the first prong of the *Terry* test is satisfied. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

Once the legitimacy of a stop is established, the Court's focus turns to its scope. A "seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes upon interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In particular, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* Once a "driver has demonstrated that he is entitled to operate his vehicle" he "must be allowed to proceed on his way." *Branch*, 537 F.3d at 336. Just two exceptions to this rule exist. First, a driver may choose to give his consent to an

extended stop. *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019). Second, an officer may extend a search where he possesses a reasonable suspicion that criminal activity is afoot. *Id.* In the latter case, "it is the government's burden to articulate facts sufficient to support reasonable suspicion." *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000). With these principles in mind, the Court turns to a review of the instant case.

## III. DISCUSSION

As discussed *supra*, courts employ *Terry*'s two-prong test in considering the constitutional validity of traffic stops. Defendant bases his argument on both prongs, contending that the stop and its scope were constitutionally impermissible. The Court considers both issues in turn.

### A. Legitimacy of Traffic Stop

The first prong of the *Terry* dual inquiry is typically quite straightforward, as most automobile stops are based on traffic violations that an officer directly observes. *See*, *e.g.*, *United States v. Robinson*, No. 3:17-00150-01, 2019 WL 4696344, at *1–2 (S.D.W. Va. Sept. 25, 2019) (defective brake light); *United States v. Chafin*, No. 3:17-00222-02, 2018 WL 2656712, at *4 (S.D.W. Va. June 4, 2018) (weaving across center line); *United States v. Kenyon*, No. 5:17-CR-35, 2018 WL 31482235, at *2 (N.D.W. Va. Mar. 8, 2018) (tailgating and speeding). An officer's "decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred," *Whren*, 517 U.S. at 809, and actually observing a traffic violation clearly meets this threshold, *Branch*, 537 F.3d at 335.

Yet observing a traffic violation is not the only justification for initiating an automobile stop. Indeed, it is well-recognized that "*Terry* stops of vehicles can be based on reasonable suspicion of any kind of ongoing criminal activity." *United States v. Kerns*, No. 2:15-cr-00217, 2016 WL 5745117, at *4 (S.D.W. Va. Sept. 30, 2016). It is likewise beyond dispute that driving

without a valid license is a violation of West Virginia law. W. Va. Code § 17B-2-1(a)(1) ("No person . . . may drive a motor vehicle upon a street or highway in this state or upon a subdivision street used by the public generally unless the person has a valid driver's license issued pursuant to this code for the type or class of vehicle being driven."). It follows that an officer with reasonable suspicion that a driver is operating a vehicle without a valid license is justified in conducting an investigatory stop. *See*, *e.g.*, *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004) (upholding seizure where officer "reasonably suspected that [Defendant] was driving without a valid license because, just three weeks earlier . . . [the officer] ran a license check . . . and learned that he did not have a valid license."); *United States v. Laulea*, Cr. No. 13-00824, 2014 WL 12666025, at *3 (D. Haw. Aug. 18, 2014) (upholding seizure where officer "had a reasonable suspicion supported by specific facts that Defendant was driving without a valid license in violation of Hawaii law"); *United States v. Gardner*, No. 3:09-cr-238-J-25JRK, 2010 WL 11519311, at *9 (M.D. Fla. Apr. 14, 2010) (upholding seizure where officer "had reasonable suspicion that Defendant was knowingly committing the crime of driving without a valid license"), *report and recommendation adopted*, 2010 WL 11519357 (M.D. Fla. May 3, 2010).

The sole question for this Court is thus to determine if the police possessed reasonable suspicion that Qualls was driving without a valid license. As has already been discussed, "[r]easonable suspicion is a commonsense, nontechnical standard that relies on the judgment of experienced law enforcement officers, not legal technicians." *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016). Officers need only point to specific, articulable facts that demonstrate a connection to criminal activity to establish reasonable suspicion. *See Williams*, 808 F.3d at 246. The officers have clearly met this burden here. Detective Maniskas engaged in a lengthy back-and-forth with dispatch to determine the status of Qualls' license, checking his home state

(Michigan), his present state (West Virginia), and another state to which he was potentially connected (Ohio). A search of each state's records did not establish the existence of a valid license; in fact, the records searches demonstrated quite the opposite. Qualls' Michigan license had apparently been terminated or suspended in 2014. His West Virginia license—if he ever obtained anything more than an ID card—was apparently inactive. His Ohio license carried a "failure to reinstate" notice with it, and no accompanying license number. These three searches, taken together, are sufficient to give rise to the reasonable, articulable suspicion that Qualls was driving without a valid license.

Defendant naturally disagrees. First, he emphasizes that Qualls' license was not, in fact, invalid. This much appears to be true, but it carries no weight for the purposes of the Court's analysis. It is well-settled that where "an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable." *United States v. Arias*, 213 F. App'x 230, at \*2 (4th Cir. 2007). In the present case, Detective Maniskas undertook a reasonable check of the three states in which he believed Qualls was most likely to have a valid license. As a records search did not reveal the existence of any such license, his mistake of fact was eminently reasonable. This is particularly true given the fact that Qualls was driving to an unknown location at the time, necessarily limiting the scope of Maniskas' records investigation. Courts and officers both recognize the heightened exigency that exists where a car is readily mobile. To take just one analogous analytical framework, the Supreme Court has long relied on the ready mobility of vehicles in upholding the automobile exception to the Fourth Amendment's warrant requirement. *See*, *e.g.*, *California v. Carney*, 471 U.S. 386, 390 (1985) ("The capacity to be 'quickly moved' was clearly the basis of the [automobile exception], and our cases have consistently recognized ready mobility as one of the principal bases of the automobile exception."); *South Dakota v.*

*Opperman*, 428 U.S. 364, 367 (1976) ("The inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible."); *Chambers v. Maroney*, 399 U.S. 42, 51 (1975) ("[T]he opportunity to search is fleeting since a car is readily movable."). This same heightened exigency applies where an officer is conducting an investigation into a traffic stop, which need only be supported by reasonable suspicion.

Defendant also contends that the dispatcher's failure to clearly state that Qualls' potential licenses were invalid defeats any reasonable suspicion to seize the van. The Court disagrees. There are no "magic words" necessary to give rise to reasonable suspicion. A review of the call between Maniskas and dispatch reveals a shared agreement that any licenses in Michigan, West Virginia, and Ohio were invalid. The failure to announce that fact with ironclad conviction does not destroy reasonable suspicion; to hold otherwise would create exactly the sort of hyper-technical standard that reasonable suspicion is not. *See Palmer*, 820 F.3d at 650.

In sum, Detective Maniskas was sufficiently diligent in his investigation of Qualls' licenses. The fact that Qualls' license was actually valid has no impact on Maniskas' reasonable suspicion that he was driving without a valid license. The initial stop of the van was therefore legitimate, and so the Court turns to an examination of its scope.

## B. Scope of Traffic Stop

The second prong of the *Terry* inquiry requires courts to consider whether a stop has been prolonged "beyond the scope of a routine traffic stop." *Branch*, 537 F.3d at 336. This is a "highly fact-specific" inquiry, focusing once again on whether officers possessed a reasonable, articulable suspicion of criminal activity to extend and expand a stop. *United States v. Guijon-Ortiz*, 660 F.3d 757, 765 (4th Cir. 2011). Here, the answer is clear. Officer Adkins testified that he approached the

driver's side window and requested Qualls' identification, and that he could immediately detect the odor of marijuana coming from the car. Detective Maniskas likewise testified that he could smell marijuana once inside the car. Defendant solicited no testimony that would tend to cast doubt on the officers' recollections. Indeed, the fact that a quantity of marijuana was later discovered on Defendant's person only serves to bolster them. Taken together with this physical evidence, the Court credits the officers' testimony as true.

It therefore follows that the officers possessed a reasonable suspicion that Qualls and Defendant were in possession of marijuana—a crime under federal and state law. *See* 21 U.S.C. § 844; W. Va. Code § 60A-2-204(b). This suspicion permitted the officers to extend the length and scope of the stop pending investigation into possible drug activity. Of course, the Court acknowledges that where "an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). Yet the odor of marijuana justified the officers' decision to call a K-9 unit, which arrived at the scene approximately fifteen minutes after the stop was initiated. At this point, the dog's positive alert to the presence of narcotics provided probable cause to search the van and discover the drugs and firearms inside. *See United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994).

As with any claim of unconstitutional police activity, the Court treats Defendant's claims with the utmost seriousness. Yet its consideration of these claims is governed by the "touchstone" of any Fourth Amendment analysis—namely, "the *reasonableness* in all circumstances of the particular governmental invasion of the citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (emphasis added). The officers' conduct throughout this case falls well within these bounds. Both the initial stop and its scope were lawful, and Defendant's motion must be denied.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Suppress, ECF No. 30, and **DIRECTS** the Clerk to send a copy of this Order to counsel and the defendant, the United States Attorney's Office, the United States Probation Office, and the United States Marshals Service.

ENTER:     January 21, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE